THE STATE, EX REL. BROTHERS, APPELLEE, *v.* ZELLAR ET AL.,
MEMBERS OF THE BOARD OF TAX APPEALS, APPELLANTS.

[Cite as State, ex rel. Brothers, v. Zellar, 7 Ohio St. 2d 109.]

(No. 39721—Decided July 13, 1966.)

*Messrs. Lucas, Prendergast, Albright & Warren* and *Mr. Rankin M. Gibson,* for appellee.

*Mr. William B. Saxbe,* attorney general, and *Mr. Robert M. Duncan,* for appellants.

MATTHIAS, J. The basic question raised by this case is created by the statutes which require that an appointment to public office by the Governor must be made with the advice and consent of the Senate. The principal issue is whether title to such office vests in the appointee after his appointment and the taking of the oath of office and any other necessary acts on the part of the appointee to qualify or whether such title vests only after the appointment is consented to by the Senate.

It is appellee's contention that neither Gould nor Douglass qualified as a member of the Board of Tax Appeals, and thus he is, as the incumbent, entitled to continue in office under the provisions of Section 3.01, Revised Code, until his successor is appointed and qualified.

Appellee urges that the advice and consent of the Senate is a part of the act of qualification.

However, appointment to and qualification for a public office as required in Section 3.01, Revised Code, are separate and distinct acts performed by different people. Appointment relates to the acts of the authority in whom the appointing power reposes. Qualification relates to the acts which the appointee must perform before he is entitled to enter upon the duties of the office. The advice and consent of the Senate is not a part of the qualification for the office.

The Court of Appeals found that the appointment is not complete until ratified by the Senate, and that under the pro-

visions of Section 3.01, Revised Code, that one holding public office continues in such office until his successor is appointed and qualified, he, the appellee, is entitled to the office in question.

It must be noted at the outset that unlike the practice in some states where the Governor nominates an individual for an office and such nomination is sent to the Senate for confirmation before the appointment is made, the procedure in Ohio is that the appointment is actually made by the Governor prior to its submission to the Senate.

To determine the question in the instant case requires an examination of Section 21, Article III of the Ohio Constitution. The pertinent parts of this provision read as follows:

*"When required by law, appointments to state office shall be subject to the advice and consent of the Senate.* * * *

*"* * * *

"If an appointment is submitted during a session of the General Assembly, it shall be acted upon by the Senate during such session of the General Assembly, *except that if such session of the General Assembly adjourns sine die within ten days after such submission without acting upon such appointment, it may be acted upon at the next session of the General Assembly.*

*"If an appointment is made after the Senate has adjourned sine die, it shall be submitted to the Senate during the next session of the General Assembly.*

"In acting upon an appointment a vote shall be taken by a yea and nay vote of the members of the Senate and shall be entered upon its journal. *Failure of the Senate to act by a roll call vote on an appointment by the Governor within the time provided for herein shall constitute consent to such appointment.*" (Emphasis added.)

This section was enacted after and apparently as a result of the decision in *State, ex rel. Burns,* v. *DiSalle, Governor,* 172 Ohio St. 363, which held that the advice and consent of the Senate constituted a part of the appointing power, and that the appointment is incomplete until the Senate acts. Therefore, the court found that such provisions in the law were unconstitutional because under the provisions of Section 27, Article II, the General Assembly was prohibited from appointing persons to public office unless so authorized by the Constitution.

Did the enactment of Section 21, Article III, vest a part of the appointing power in the Senate?

Ordinarily the word, "appoint," means to name or designate some person to hold an office. It involves a matter of choice in the selection of the person to hold the office. In Ohio such selection or choice is imposed completely in the Governor. Section 21 imposes no right of selection in the Senate but rather the right, where provided by statute, to review the appointment made by the Governor and if dissatisfied therewith to reject such appointment. It is apparent from an examination of Section 21 that no power to appoint was vested in the Senate, that at the time the Senate acts the appointment is complete, and that the Senate has only the negative power to reject such appointment.

The section itself recognizes that the appointment is complete prior to the submission to the Senate. The wording of Section 21 is that appointments are subject to the advice and consent of the Senate.

Thus, the appointment by the Governor confers upon the appointee the right to take and hold the office until such time as the Senate acts to reject his appointment.

In other words, the appointive power is in the Governor and the appointment vests the title to the office in the appointee as soon as the appointee performs the necessary acts on his part to qualify for such office, and such title is vested subject to being divested by the action of the Senate rejecting the appointment.

That such is the meaning and effect of the provision that appointments may be subject to the advice and consent of the Senate is exemplified by the other provisions of Section 21 that, if the Senate fails to act on an appointment within the time provided, such failure constitutes consent to the appointment, and that if appointments are made after the Senate has adjourned such appointments may be submitted at the next General Assembly, and, if the Senate adjourns within ten days after the appointment is made, it may act upon it at the next session of the General Assembly. All these provisions indicate that the actual appointment is valid and effective when made by the Governor, and that the appointee holds title to the office from the time he qualifies therefor.

This section, enacted after the decision in the *Burns case*, expresses an intention not to invest the Senate with the appointive power but to establish that there was no such appointive power in the Senate and to exemplify the fact that such power reposes strictly in the Governor with only the power in the Senate to reject such appointments by affirmatively acting thereon. This section requires affirmative action on the part of the Senate to reject the appointment; nonaction under the very terms of the section constitutes consent.

To follow appellee's theory that the appointment is not completed until consented to by the Senate would completely subvert the orderly processes of government. Appointments necessarily must be made at times when the Senate is not in session, in fact at times when the Senate may not be in session for many months. Even if an appointment is made while the Senate is in session, action may be delayed thereon for many months. If the appointment is not effective when made by the Governor, the effect would be to extend the term of the incumbent far beyond his designated term or require the Governor to dismiss the officer and work without assistance. It would result in the executive being compelled to work with persons not of his own choice whose theories and policies would be completely inimical to those of the administration.

Thus, it is clear that after Gould had been appointed by the Governor and had performed the necessary acts of qualification he became vested with the title to the office. A successor had been appointed and qualified within the meaning of Section 3.01, Revised Code, and appellee's tenure in the office terminated.

Two subsidiary issues were raised in this case.

One relates to the action of the Senate relating to the appointment of Gould. The vote on Gould's appointment was 15 yeas to 16 nays. It is argued that this did not constitute action by the Senate, on the ground that to act on an appointment there would be required 17 votes, either yeas or nays, this being a majority of the Senators provided for in the Constitution.

This argument is without merit. Section 21, Article III, requires that:

"No appointment shall be consented to without concurrence

of a majority of the total number of Senators provided for by this Constitution, except as hereinafter provided for in the case of failure of the Senate to act. If the Senate has acted upon any appointment to which its consent is required and has refused to consent, an appointment of another person shall be made to fill the vacancy.''

It is only required that consent be by a majority of those elected. It does not require a majority vote of those elected to reject an appointment. Failure to obtain a constitutional majority for consent constitutes a rejection of the appointment.

The second issue relates to the appointment of Douglass. As pointed out above, Douglass' appointment was submitted to the Senate for its advice and consent. The appointment was referred to the Rules Committee, and the Senate adjourned sine die without considering the appointment.

It is appellee's contention that the referral of the appointment to the Rules Committee constituted action thereon by the Senate within the meaning of that part of Section 21, Article III, which reads as follows:

''In acting upon an appointment a vote shall be taken by a yea and nay vote of the members of the Senate and shall be entered upon its journal. *Failure of the Senate to act by a roll call vote on an appointment by the Governor within the time provided for herein shall constitute consent to such appointment.*'' (Emphasis added.)

It is, of course, appellee's theory that the Senate acted thereon so that the adjournment sine die did not operate as a consent to the appointment.

The action of the Senate referred to in this section relates to the Senate's either accepting or rejecting the appointment; it does not relate to the administrative action in the internal operation of the Senate. Appellee's point is not well taken.

The judgment of the Court of Appeals is reversed and final judgment rendered for appellants.

*Judgment reversed.*

TAFT, C. J., HERBERT and SCHNEIDER, JJ., concur.
ZIMMERMAN, O'NEILL and BROWN, JJ., dissent.

TAFT, C. J., concurring. I am in general agreement with the majority opinion except for its apparent conclusion that Section 21 of Article III of the Ohio Constitution does not provide for Senate participation in the appointive process. However, in my opinion, it is not necessary to determine whether it does or does not provide for such Senate participation.

The second sentence of the second paragraph of Section 21 is dispositive of this case, except as to the 13 days prior to February 24, 1965.

We all agree that on February 24, 1965, the Senate effectively refused to advise and consent to Gould's appointment. The second sentence of paragraph two of Section 21 reads:

"* * * If the Senate has acted upon any appointment to which its consent is required and has refused to consent, an appointment of another person shall be made to fill the vacancy."

Thus, when the Senate refused to consent to Gould's appointment, there was a "vacancy." The words of the Constitution are susceptible of no other interpretation. A vacancy in the office is wholly irreconcilable with Brothers' being in the office.

*State, ex rel., v. Howe* (1874), 25 Ohio St. 588, 18 Am. Rep. 321, involved an interpretation of Sections 2 and 3 of Article VII of the Constitution as adopted in 1851. Section 2 provides that certain officers "shall be appointed by the Governor, by [Section 21 of Article III omits "by"] and with the advice and consent of the Senate;" and Section 3 gives the Governor "power to fill all vacancies" in such offices "until the next session of the General Assembly, and, until a successor to his appointee shall be confirmed and qualified." This court held that there would be no vacancy in an office within the meaning of Section 3 if there was an incumbent in the office to hold over until a successor was appointed with consent of the Senate.

This case involves an interpretation of Section 21 of Article III of the Constitution as adopted in 1961.

Section 21 contains no provision specifically relating to "vacancies" such as Section 3 of Article VII. The only mention of a vacancy in Section 21 is the one quoted above from the second paragraph thereof.

Unlike in Section 3 of Article VII, there is nothing in Sec-

tion 21 limiting the effectiveness of an appointment prior to Senate consent to a situation where a vacancy exists.

The fourth paragraph of that section does provide that "if an appointment is made after the Senate has adjourned sine die, it shall be submitted to the Senate during the next session of the General Assembly."

If Section 21 is given the construction suggested by the dissenting opinion (*i. e.*, requiring Senate consent before an appointment can be effective) and unless the fourth paragraph is interpreted to authorize a recess appointee to a vacancy to serve until the Senate reconvenes, intolerable results might follow.

For example, if two members of the Board of Tax Appeals should die and the Senate was not in session or should neglect to act upon the Governor's appointees to fill the vacancies, the Board of Tax Appeals would be unable to function. The same situation might arise with respect to the Public Utilities Commission. These and other organizations cannot function at all without at least a majority of incumbents.

In my opinion, the fourth paragraph of Section 21 was intended to provide for recess appointees who could function in office until the Senate refused to confirm them. I find nothing in Section 21 to indicate an intention that the appointments dealt with in the third paragraph of that section should be less effective before Senate action than recess appointments made under the fourth paragraph.

The exception in the third paragraph indicates an intention that appointees thereunder should be treated the same as the recess appointees dealt with in the fourth paragraph. The last sentence of Section 21 fortifies the conclusion that the Senate's power is limited to rejecting an appointee of the Governor and cannot prevent the appointment from being effective before consent to the appointment has been given.

The general provisions of the first paragraph of Section 21, validating, ratifying and confirming previous statutory provisions requiring advice and consent, would of course be controlled by the specific requirements in the subsequent portions of Section 21.

SCHNEIDER, J., concurs in the foregoing concurring opinion.

O'NEILL, J., dissenting. The majority and concurring opinions are not consistent in rationale and both are directly contra to the settled law of this state.

(1) These opinions abrogate by judicial fiat the constitutional and statutory power of the Senate to advise and consent to a gubernatorial appointment and substitute for that power a power to remove from office a person vested with title to that office who is performing the duties and exercising the powers of that office. This power of removal, to be exercised during a regular session, is extended to persons placed in office by the Governor during that regular session of the Senate and to persons placed in office by the Governor at any time after the sine die adjournment of the previous regular session.

(2) These opinions leave an office with no one authorized to perform the duties or exercise the powers of the office each time that the Senate acts to remove an official from his office.

Both the majority and the concurring opinions seem impelled to make this major and undesirable change in the settled law for only one reason. That reason is expressed in the concurring opinion as a fear of what could happen if two or more members of the Board of Tax Appeals should die at the same time while the Senate is not in session.

First, that hypothetical situation is not this case. In this case, there is a duly appointed and qualified holdover incumbent authorized by statute to continue to perform the duties and exercise the powers of the office until another person has been appointed (by action by the Governor consented to by the Senate) and qualified to assume the office.

Second, the hypothetical situations which the majority and concurring opinions allude to are effectively provided for by the settled law.[1]

---

[1]Two fundamental propositions underlie the constitutional and statutory provisions which require the advice and consent of the Senate to certain gubernatorial appointments to state office.

These two propositions are:

1. That the best men are secured for appointive public office by requiring that such men meet not only the approval of the Governor but also the approval of the Senate before they assume the office, *Howe, supra.* Thus, the initial selection is made by one man, but the qualifications and abilities

This case involves an appointment to the Board of Tax Appeals.

The statutory term of the incumbent, Merrill D. Brothers, appellee herein, who was appointed by the Governor and to which appointment the Senate gave its advice and consent, expired on February 8, 1965, while the Ohio General Assembly was in regular session.

On February 5, 1965, the Governor submitted to the Senate the appointment of James R. Gould for a full term as the successor to Brothers. On February 24, the Senate, by a vote of 16 nays to 15 yeas, *refused* to advise and consent to that ap-

---

are judged by the several men in the Senate with different perspectives and different motivations, who share the power of and responsibility for the appointment with the executive. The Federalist (Cooke, Ed.), Nos. 76 and 77 (Hamilton), 509 and 515.

2. That equally important with this first proposition is the second proposition that so far as possible under the law each office should have an incumbent to perform the duties of this office at all times and, therefore, there must be a procedure by which an office, upon the expiration of the term of an incumbent or the occurrence of a vacancy by death or resignation of the incumbent, may be promptly filled so that government can proceed in an orderly way without interruption.

The law which has supported and made effective both these fundamental propositions has been settled in Ohio since the case of *Howe*, decided in 1874. That law is:

1. An appointment is not complete until it is submitted by the Governor to the Senate and the advice and consent of the Senate is granted by a majority vote of all the elected Senators.

2. (a) A "vacancy" in an office does not occur upon the expiration of the term of the holder of the office, whether this term expires during a regular session of the Senate or while the Senate is not in session.

(b) The duly appointed (by action of the Governor and consent of the Senate) and qualified holder of an office continues in that office during his appointed term and thereafter until his successor is appointed (by action of the Governor and consent of the Senate) and qualifies.

(c) A "vacancy" in an office occurs when there is no one who has been duly appointed (by action of the Governor and consent of the Senate) and qualified available to continue to serve until his successor is appointed and qualified. A vacancy thus occurs only when there is a death or resignation of an office holder.

(d) When a vacancy (death or resignation) occurs during a regular session of the Senate then the Governor is in a position to promptly submit an appointment to the Senate and the Senate is in a position to promptly act upon such appointment.

pointment. Paragraph 2 of Section 21 of Article III of the Ohio Constitution. (Seventeen Senators constituted a majority of the total number of Senators.)

The Governor then submitted the appointment of Francis B. Douglass to the Senate on April 7, 1965. The Senate adjourned its regular session sine die on September 1, 1965, without acting on that appointment. Such adjournment constituted consent to the appointment of Douglass, as of September 1, 1965, by operation of law. Paragraph 5 of Section 21, Article III of the Ohio Constitution.

The question which is presented then is whether Brothers

---

(e) Where a "vacancy" (death or resignation) occurs while the Senate is not in session and, therefore, not in a position to act on its own promptly because it could not return to session except by call of the Governor, the Governor has the power to make an appointment and the appointee is authorized to qualify and serve in the office, but the Governor must submit the appointment to the Senate at the next regular session for its action.

(f) If the term of an office is scheduled to expire after a regular session of the Senate is expected to adjourn, the Governor may submit an appointment for that office to the Senate before it adjourns and, if the Senate consents to the appointment or pursuant to Section 21 of Article III if such appointment is submitted more than ten days prior to sine die adjournment and the Senate adjourns without acting upon such appointment, that appointee may then qualify and assume the office upon the expiration of the term of the holder of the office, or the Governor may let the incumbent hold over, after the expiration of his term, until the next session of the Senate and submit his appointment to the Senate, and, upon consent by the Senate, the new appointee may then qualify and assume the office.

These settled principles of law have governed appointments to office which are subject to the consent of the Senate for more than 90 years in Ohio and served both the fundamental propositions of sound governmment well.

*State, ex rel. Burns,* v. *DiSalle, Governor, supra,* held that there was no constitutional authority for certain statutory provisions requiring advice and consent of the Senate to appointments to certain offices, which statutory provisions had been followed for years without their constitutional authorization being questioned.

As soon as the decision in *State, ex rel. Burns,* v. *DiSalle, Governor, supra,* was announced, the General Assembly promptly proposed a constitutional amendment providing that constitutional authority for requiring by statute Senate advice and consent to any gubernatorial appointment to any state office be granted and validating those statutes previously enacted containing a requirement for "advice and consent" of the Senate to appointments to state office. This amendment was passed overwhelmingly by the people.

continued to hold the office of member of the Board of Tax Appeals from the expiration of his statutory term on February 8, 1965, until the appointment of his successor, Douglass, was made complete by being consented to by the Senate by operation of law on September 1, 1965, pursuant to the provisions of Section 21, Article III of the Ohio Constitution.

Section 3.01, Revised Code, provides:

"A person holding an office of public trust shall continue therein until his successor is elected or *appointed* and qualified, unless otherwise provided in the Constitution or the laws of this state." (Emphasis added.)

There is no contrary provision in the Constitution or the statutes with respect to this office.

Pursuant to Section 3.01, *supra,* Brothers would continue to hold the office until September 1, 1965, if there is a constitutionally valid statutory provision which requires the "advice and consent" of the Senate to an appointment of a member of the Board of Tax Appeals, and if such provision makes the "advice and consent of the Senate" a necessary part of the appointment, that is, if the Senate, as a matter of law, must "advise and consent" to the appointment of a member of the Board of Tax Appeals before such appointment is complete. *State, ex rel.,* v. *Howe* (1874), 25 Ohio St. 588; *State, ex rel.,* v. *Wright,* 56 Ohio St. 540; *State, ex rel. Hoyt,* v. *Metcalfe,* 80 Ohio St. 244; *State, ex rel. Bolsinger,* v. *Oridge,* 134 Ohio St. 206; *State, ex rel. Glander, Tax Commr.,* v. *Ferguson, Aud.,* 148 Ohio St. 581.

There are three principles of law which are dispositive of this case. All three of these principles are set forth in *State, ex rel.,* v. *Howe, supra,* and have been followed without deviation by this court since that case was decided. The three rules of law are:

1. Where the statute provides for an officer to hold his office beyond his fixed term until a successor is duly appointed and qualified, the expiration of such a term of office does not create a vacancy. *State, ex rel.,* v. *Howe, supra,* pages 594 to 599, inclusive, paragraph one of the syllabus.

2. Where the law provides that appointments by the Governor to an office are to be submitted to the Senate for its

advice and consent, the Governor has no power to appoint, without the confirmation of the Senate, except to fill a vacancy (created by death or resignation) when the Senate is not in session. *State, ex rel.,* v. *Howe, supra,* pages 593, 594, 595.

3. When an appointee holds over in his office beyond the expiration date of his fixed statutory term, the period of holding over is a part of his existing original term and not a part of the new statutory term. *State, ex rel.,* v. *Howe,* pages 597 to 599, inclusive.

The first paragraph of the syllabus of *State, ex rel.,* v. *Howe, supra,* reads as follows:

"Where an officer appointed by the Governor, by and with the advice and consent of the Senate, is authorized by law to hold his office for a term of three years, and until his successor is appointed and qualified, and no appointment of a successor is made by the regular appointing power at the expiration of his term of three years, the office does not become vacant; but the incumbent holds over as a *de jure* officer until his successor is duly appointed and qualified."

In *State, ex rel. Burns,* v. *DiSalle, Governor,* 172 Ohio St. 363, decided on July 5, 1961, this court held invalid statutory provisions requiring the advice and consent of the Senate to appointments by the Governor (comparable to those appointments of members of the Board of Tax Appeals under Section 5703.03, Revised Code), except in those instances where such "advice and consent requirement" was authorized by the Constitution.

The "advice and consent" provision of Section 5703.03, *supra,* was not authorized by the Constitution as it existed prior to the adoption of Section 21, Article III of the Constitution.

At the general election held on November 7, 1961, in response to the decision in *State, ex rel. Burns,* v. *DiSalle, Governor, supra,* Section 21 of Article III of the Ohio Constitution was adopted, which provides in paragraph one thereof:

"When required by law, appointments to state office shall be subject to the advice and consent of the Senate. All statutory provisions requiring advice and consent of the Senate to appointments to state office heretofore enacted by the General Assembly are hereby validated, ratified and confirmed as to all

appointments made hereafter, but any such provision may be altered or repealed by law.''

Thus, Section 5703.03, *supra*, was made constitutionally valid. It requires the "advice and consent of the Senate" to a Governor's appointment of a member of the Board of Tax Appeals. It provides in pertinent part as follows:

"* * * The Governor, with the advice and consent of the Senate, shall appoint three members of the Board of Tax Appeals for terms of six years each * * *.''

This court must determine whether this constitutionally valid requirement of the "advice and consent of the Senate" to the appointment while the General Assembly is in regular session of a member of the Board of Tax Appeals is a necessary part of the appointing power, and, if it is, whether such appointment is complete until such action is taken by the Senate.

Under the language of Section 5703.03, quoted above, it would appear to be clear that the advice and consent of the Senate is a necessary part of the appointing power.

However, it is not necessary to speculate about the meaning or proper construction of this language or the intent of the General Assembly in enacting it, because the precise question has been determined by this court.

It was first determined in *State, ex rel.,* v. *Howe* (1874), *supra*. The court in that case recognized that the *Senate and the Governor together constituted the regular appointing power* and that an appointment by the Governor alone had no force except in a case where a vacancy (created by death or resignation) occurred during a recess of the Legislature. At page 594, the court noted the nature of the appointing power, in the following language:

"* * * Successors to incumbents must be appointed by the Governor, by and with the advice of the Senate, and in no other way. And appointments to fill vacancies must be made in the same way, except, only when the General Assembly is not in session, the Governor alone may make temporary appointments; thus plainly distinguishing between *successors* and *appointees to fill vacancies.*

"* * *

"* * * It is manifestly the design of the Constitution, as

well as of the statute, to secure to such office, an incumbent who possesses the confidence and approval not only of the Governor, but also of the Senate of the state. * * *''

The proposition of law that, where the statute provides for the ''advice and consent'' of the Senate to an appointment by the Governor, this constitutes a necessary part of the appointing power, *i. e.*, a sharing of the power of appointment by the Governor and the Senate, has been accepted as the law of Ohio and followed by the courts and the Attorneys General of this state since *State, ex rel.*, v. *Howe* was decided in 1874. See, also, 81 Corpus Juris Secundum 1001, Section 68b(2).

Most of the questions which have arisen concerning the ''advice and consent'' of the Senate to appointments by the Governor have been determined over the years by opinions of the Attorneys General, although, because of the natural controversy which surrounds appointments to positions of great power and the partisan considerations which are frequently involved, numerous cases have come to this court which have dealt with the problem of the advice and consent of the Senate to appointments. In all those cases, as well as in all the opinions of the different Attorneys General, the proposition of law expressed in *State, ex rel.*, v. *Howe, supra,* has been followed, that, as to those appointments made by the Governor while the General Assembly is in session, the advice and consent of the Senate is a necessary part of the power of appointment and the appointment is not complete until such valid action is taken by the Senate. *State, ex rel. Burns,* v. *DiSalle, Governor, supra;* Opinions of Attorney General (1923), 245; Opinions of Attorney General (1953), 329; Opinions of Attorney General (1955), 188; Opinions of Attorney General (1962), 769.

Opinions of the Attorney General are not binding upon this court, but one of the most comprehensive opinions dealing with this specific problem is opinion No. 3318, Opinions of Attorney General (1962), written by Attorney General Mark McElroy. It should be noted that that opinion was written after the adoption of Section 21 of Article III of the Ohio Constitution.

In *State, ex rel. Burns,* v. *DiSalle, Governor, supra,* this

court considered the exact question which is now before this court. The rule of law pronounced in that case is determinative of this case. In that case, which turned on the very point at issue here, a unanimous court approved the syllabus, which states in part:

"The provision of Section 3769.02, Revised Code, which requires that the name of appointees to the State Racing Commission be submitted to the Senate for its 'advice and consent,' confers upon the General Assembly an appointive power * * *."

Judge Bell, writing for the unanimous court, stated the law clearly when he determined that "the 'advice and consent' of one branch of the General Assembly is a necessary part of an appointment by the Governor," in these words:

"* * * Since the appointment is incomplete without the advice and consent of the Senate, the 'advice and consent' action by the Senate is necessarily a part of the appointing power." (Emphasis added.)

This court determined that question as early as 1874, has followed that rule of law since then without deviation and reaffirmed it unanimously in Burns, supra, in 1961. There would, therefore, seem to be little question that, under the language of the statute we are now dealing with, Section 5703.03, supra, when the appointment is made while the Senate is in session, the action of the Senate is a necessary part of the Governor's power of appointment.

This court has consistently held that, where a Governor's appointment, made while the General Assembly is in regular session, is subject to the advice and consent of the Senate by statute, such advice and consent is a necessary part of the appointing power, and an appointment subject to such provision is not complete until the Senate has taken action to consent. Section 21, Article III of the Ohio Constitution, was specifically designed to constitutionally validate such statutory provision.

The only thing that remains is for this settled law to be applied to the facts in this case.

Gould's appointment was never complete because the Senate refused to advise and consent to it.

Douglass' appointment was complete, by operation of law,

126

on September 1, 1965, because on that day the Senate adjourned its regular session sine die without acting upon his timely submitted appointment. Paragraph 5 of Section 21, Article III of the Ohio Constitution.

Pursuant to Section 3.01, *supra,* and paragraph one of the syllabus of *Howe, supra,* Brothers held the position of member of the Board of Tax Appeals until his successor's appointment was made complete on September 1, 1965, by operation of law.

This has been the law and the practice in Ohio since *State, ex rel.,* v. *Howe, supra,* with regard to appointments to state office made while the General Assembly is in session where the advice and consent of the Senate is required by statute.

It can be noted that in the agreed statement of facts in this case Brothers' appointment was submitted to the Senate on February 28, 1959. He was commissioned, filed his bond and took the oath of office that day. The Ohio Senate gave its advice and consent to his appointment on March 10, 1959. He was placed on the payroll on March 10, 1959, because his appointment was not complete, under the law, until that date.

The position of the majority opinion is stated in these words:

"Ordinarily the word, 'appoint,' means to name or designate some person to hold an office. It involves a matter of choice in the selection of the person to hold the office. In Ohio such selection or choice is imposed completely in the Governor."

The conclusion which the majority reaches in this case, without the citation of any case law, rests upon the above unsupported assertion. That position is directly contra to the holding of this court in *Burns, supra,* under a rule of law which has been followed by this court since *State, ex rel.,* v. *Howe, supra,* decided in 1874.

The only argument advanced by the majority opinion for its position is stated in these words: "[The theory that] the appointment is not completed until consented to by the Senate would completely subvert the orderly processes of government."

The answer to that argument is the fact that that has been the law, procedure and practice in Ohio for 92 years, and it certainly can not be validly said that following that law has com-

pletely subverted the orderly processes of government in this state. See *Howe, supra*, last paragraph on page 598, including first paragraph on page 599.

It should be pointed out that a Governor is not saddled with most department heads (who are ordinarily referred to as cabinet members) not of his choosing because these officials are not appointed for a fixed term but serve at the pleasure of the Governor and can be dismissed at his pleasure. See Section 121.03, Revised Code.

In its reasoning, the majority opinion refers to appointments to fill vacancies which may be made when the Senate is not in session.

That, of course, is not this case, and beginning with *State, ex rel.*, v. *Howe, supra*, the Ohio law has recognized recess appointments to fill vacancies (created only by death or resignation) and applied a different rule from the rule applied to such appointments made when the General Assembly is in session, for sound and practical reasons.

The majority opinion seems to rely upon the language of Section 21, Article III of the Ohio Constitution.

There is no language in Section 21 of Article III of the Constitution which defines or deals with the nature or extent of the power of the Senate to advise and consent to appointments by the Governor.

Paragraph one gives constitutional validity to a statutory requirement that appointments to state offices shall be made subject to the advice and consent of the Senate and validates all the statutory provisions requiring advice and consent of the Senate to appointments to state offices heretofore enacted by the General Assembly.

Paragraphs two, three, four and five prescribe the mechanics by which such advice and consent can be granted or withheld by the Senate, both as to manner and time.

There is no language in this section which purports to deal with the nature, extent or definition of the power of the Senate to advise and consent to appointments. This is for the very obvious reason that the law with regard to the nature of this power has been well defined by this court for many years. The

128

General Assembly felt so strongly about the importance of the Senate's established power to share in the power of appointment with the Governor that it submitted a constitutional amendment to a vote of the people (Section 21, Article III) to constitutionally assert the Senate's statutory power and make it constitutionally valid after the decision in *Burns* v. *DiSalle, supra.*[2]

[2]A brief history of Senate Joint Resolution No. 23, the adoption of which resulted in the submission of Section 21 of Article III to a vote of the people as an amendment to the Ohio Constitution, will serve to indicate the interest of the members of the General Assembly in preserving the right of the Senate to share in the power of appointment with the Governor.

On July 12, 1961, five legislative days after the decision in *State, ex rel. Burns,* v. *DiSalle, Governor, supra,* was announced by the Supreme Court, Senate Joint Resolution No. 23, which, when introduced on February 6, 1961, by Senator Hoffman, was concerned with bipartisan appointments to state office, was called up on the floor of the Senate and an amendment was introduced which deleted all the provisions of the proposed Section 21 and inserted in lieu thereof entirely new matter which, in effect, provided constitutionally for appointments to state offices where provided by statute to be subject to the advice and consent of the Senate, and attempted to make that requirement retroactive to the portion of the term of any appointive officer unexpired on the effective date of the amendment. The effect of this would have been to make subject to the advice and consent of the Senate the unexpired term of Hoffheimer who was the subject of the litigation in *State, ex rel. Burns,* v. *DiSalle, Governor.*

A further provision was made that appointments to vacancies requiring advice and consent of the Senate, which occur during recess year, be filled by granting commissions which expire at the end of the next regular session if not consented to by the Senate.

This passed the Senate on the same day by a vote of 27 to 11.

After House committee consideration, this joint resolution was reported to the floor of the House on August 1, 1961, as amended in committee and, with two minor amendments agreed to on the floor of the house, the language then read as it did when adopted by a vote of the people.

Under suspension of the rules, this resolution was taken up for immediate consideration and adopted unanimously, and on that same day it was taken up, under suspension of the rules, in the Senate, and the amendments were agreed to unanimously.

The speed with which this resolution, designed to assert the consent of the Senate as a necessary part of the power of appointment by the Governor, was acted upon is an indication of the strong bipartisan feeling of the members of the General Assembly concerning the importance of constitutionally asserting the right of the Senate to share in the Governor's power of appointment of persons to state offices.

If the General Assembly had accepted the position of the majority opinion that the power of appointment should be exclusively the Governor's, there would have been no need for the submission to the people of a constitutional amendment to validate that statutory power and require that a Governor submit his appointments to the Senate for its advice and consent whenever the statute so provides.

The philosophical reason for a requirement that appointments shall be with the consent of the Senate is not to establish a check upon the Governor in the making of appointments, but rather in the public interest to provide the Senate with an opportunity to determine the ability, the integrity, the experience and other qualifications of appointees to high state office. Ordinarily these appointments are considered very quickly, although usually not without inquiry by Senators into the qualifications of the appointee. Occasionally when controversies arise, hearings are held, the appointee is questioned concerning his qualifications and witnesses are sometimes heard.

It should be obvious that since this is the purpose of this power being vested in the Senate, the appointee should not be permitted to exercise the power of the office until his qualifications to do so have been examined and approved by the Senate consenting to his appointment when the General Assembly is in regular session at the time the appointment is made.

The work of the Board of Tax Appeals requires that it act in a nonpartisan fashion in the performance of its quasi-judicial duties. Not more than two members of the board may be members of the same political party, and a member serves a six-year term which extends beyond the term of the Governor appointing him. There is, therefore, no validity to the argument that, because a Governor can not immediately appoint, without consent of the Senate, a person of his choice to the Board of Tax Appeals, this impairs the orderly process or the efficiency of the operation of government.

The concurring opinion declines to agree with the conclusion of the majority opinion that, even though the Constitution and the statute require the advice and consent of the Senate to a gubernatorial appointment, such advice and consent is *not* a

130

part of the power of appointment because the power of appointment is the Governor's exclusively.

The concurring opinion bases its conclusion upon two premises: (1) That upon the refusal of the Senate to advise and consent to an appointment of a successor to an incumbent submitted by the Governor a "vacancy" occurs; (2) that, when such vacancy occurs during a regular session of the Senate, such vacancy can be filled by appointment by the Governor and upon qualification the appointee acquires title to and can assume the office without the advice and consent of the Senate.

Both these premises are contrary to the settled law of Ohio. *State, ex rel., v. Howe, supra; State, ex rel., v. Wright, supra; State, ex rel. Hoyt, v. Metcalf, supra; State, ex rel. Bolsinger, v. Oridge, supra; State, ex rel. Glander, Tax Commr., v. Ferguson, Aud., supra; State, ex rel. Burns, v. DiSalle, Governor, supra.*

The concurring opinion interprets the word, "vacancy," as used with regard to the power of the Senate to advise and consent to a gubernatorial appointment to mean something different in Section 21 of Article III of the Constitution than it means when used in regard to the power of the Senate to advise and consent to a gubernatorial appointment in Sections 2 and 3 of Article VII of the Constitution.

When the General Assembly adopted the resolution to submit to a vote of the people Section 21 of Article III of the Constitution the members knew that the word, "vacancy," had a definite and well-established legal meaning in Ohio law. There is no language in Section 21 of Article III to indicate an intent that the word, "vacancy," as used in that section, should have a different meaning from that which it has been given by the courts of this state when used in the Constitution in this same context in Sections 2 and 3 of Article VII.

According to the concurring opinion, no one was authorized to exercise the duties and powers of the office of member of the Board of Tax Appeals here under consideration from February 24 to April 7.

The majority and the concurring opinions abrogate the power of the Senate to consider the qualifications of the Govern-

or's appointee to an office and to either grant or deny consent to that appointment and substitutes in place of that power a power of removal of a person, placed in office by the Governor, who is occupying an office and performing the duties and exercising the powers of that office.

Under the established law prior to this decision, this power is granted only in the emergency situation created by death or resignation of an office holder while the Senate is not in session.

This power to remove is entirely different in nature and in effect from what has been known in Ohio as the power to advise and consent to an appointment. This power of removal which is created by the concurring and majority opinions is to be exercised without a charge being brought against the office holder, without a hearing and without the necessity for stating any reason for his removal from office.

One would have to be extremely naive not to discern the dangers and evils which are inherent in this kind of new power. This power of removal is to be placed in the hands of the Senate during its regular session and exercised with regard to any office holder appointed by the Governor during that session and with regard to any office holder appointed by the Governor since the sine die adjournment of the last previous regular session. These men will not be appointees whose qualifications are to be passed upon for the purpose of determining whether they shall assume the office, but rather these will be office holders already exercising great power in many sensitive areas of government where Senators are constantly called upon by constituents and, in some instances, by clients to perform favors, including the securing of favorable decisions in matters of great import.

One need only to point out a few of the sensitive offices and departments where the opportunity for great evil is manifest under such a system. Examples are the Industrial Commission, the Tax Commissioner, the Board of Tax Appeals, the Public Utilities Commission, the Turnpike Commission, and even the more sensitive areas of the Liquor Control Commission and the State Racing Commission.

To place a powerful Senator in the position of requesting a favorable decision from a department head or a board or com-

mission member *who has the power to make the decision at the same time that he needs the vote of the Senator in order to continue to have the power to perform the duties of his office is to create a most undesirable situation.*

The only reason advanced by the concurring opinion for making this major change in what has been the accepted law and the practice in regard to appointments being made subject to the advice and consent of the Senate for over 90 years is a hypothetical example that "if two members of the Board of Tax Appeals [or the Public Utilities Commission] should die" or resign when the Senate is not in session, such agency could not perform its duties.

This is a "straw man" argument. It is not this case. Paragraph 4 of Section 21 of Article III contemplates and approves what has been the law of Ohio since *Howe, supra,* that, when a vacancy (which is created only by death or resignation) occurs in a position while the Senate is not in session, the Governor is empowered to fill this vacancy and report his appointment to the next session of the Senate. This is ordinarily referred to as a recess appointment. This exception to the general rule has been recognized because of the necessity for the continuation of the business of the state in an uninterrupted and orderly fashion.

The concurring opinion then attempts to make that situation analogous to the death or resignation of an office holder while the Senate is in session and then apply that rationale to the situation in this case where there has been no death or resignation, but only the expiration of a term of office followed by an unfavorable action with regard to an appointee to that office.

The law, Section 3.01, Revised Code, is that in such instances the incumbent holds over until his successor is appointed (by action of the Governor and consent of the Senate) and qualified, and the law is equally clear that, when a death or resignation occurs while the Senate is in session, the Governor is in a position to make a prompt appointment to fill such vacancy and the Senate is in a position to act promptly upon such appointment.

The best answer to this argument is that the possibility of "intolerable results" which the concurring opinion views with such alarm have not occurred during the last 90 years that this law has been in effect and followed in Ohio, and there is no valid reason to believe they will occur.

I agree with the majority opinion with regard to paragraphs one, two, three and four of the syllabus.

For the reasons I have pointed out, I do not agree with paragraphs five and six of the syllabus. Those paragraphs are directly contra to the decision of this court in *State, ex rel. Howe, supra,* and *State, ex rel. Burns,* v. *DiSalle, Governor, supra,* and to language in the provisions of Section 21 of Article III of the Ohio Constitution as this court has interpreted that language for many years.

I agree, as I have indicated, with the majority conclusion that when an appointment has been submitted to the Senate more than ten days prior to sine die adjournment of the General Assembly, and the General Assembly adjourns sine die without the Senate acting upon this appointment, as a matter of law the appointment has been consented to by the Senate.

The sole remaining question is whether Brothers should be entitled to be compensated during the holdover period at the rate of $8,400 per year, which was his salary during his statutory term in office, or at the rate of $12,000 per year, which increase in salary was enacted during his statutory term in office. Section 20 of Article II of the Ohio Constitution inhibits a change of "salary of any officer during his existing term."

The answer to this question depends upon whether the period during which he was entitled to hold over is to be considered a continuation of his existing term or a new term.

After the expiration of his six-year statutory term, Section 3.01, *supra,* authorized him to *continue* in office until a successor should be *appointed* and qualified. The use of the word, "continue," in Section 3.01, *supra,* would indicate that the Legislature intended that the holdover period be a continuation and, therefore, a part of his existing term. *State, ex rel. Hoyt,* v. *Metcalfe, supra; State, ex rel.,* v. *Wright, supra.* See, also,

*State, ex rel. Glander, Tax Commr.,* v. *Ferguson, Aud., supra;* Opinions of Attorney General (1923), 245, *supra;* Opinions of Attorney General (1955), 188, *supra.*

The facts of the *Glander case, supra,* were that on January 1, 1945, Glander was appointed Tax Commissioner and was to serve until February 1947. After his term expired, he held over until June 30, 1947, and was thereafter appointed to serve from July 1, 1947, to February 1951. During his holdover period, after the expiration of his statutory term, the salary of the Tax Commissioner was increased (June 14, 1947).

The question was whether he was entitled to receive the higher salary. The answer to that question depended upon whether it had been enacted during his "existing term."

This court held that he was entitled to the higher salary, stating in the syllabus that the words, "during his existing term," apply to the term to which the officer is appointed, which is for the duration of his statutory term and until his successor is appointed and qualified, and that the inhibition against increase in salary does not apply where a person is appointed to the partially expired term, where the salary is increased during the statutory period of the new term but prior to the time the officer is appointed.

According to this holding, the new term does not begin until someone is appointed to it, even though the statutory period over which the term extends starts when the previous statutory term expires.

At page 587 in the opinion, the court said, on authority of *State, ex rel.,* v. *Howe, supra,* paragraph one of the syllabus, and Section 8, General Code (Section 3.01, Revised Code):

"It clearly follows that, unless otherwise expressly provided, the time of holding over by an elected or appointed officer *is a continuation of the old term and not a part of the new term.*" (Emphasis added.)

The court in *Glander, supra,* at page 588, quotes from *State, ex rel. Bolsinger,* v. *Oridge, supra,* where the court, discussing what is now Section 3.01, *supra,* said:

"* * * By its provisions, *the term of the person holding the*

*office or public trust ends as soon as the term of service of a duly elected or appointed and qualified successor begins."*

In other words, if the incumbent holds over he continues to serve his previous term until a person is appointed and qualified for the new term. Until this occurs, the old term continues. See *State, ex rel. Hoyt,* v. *Metcalfe, supra.*

It is clear from those cases that the extension provided by Section 3.01, *supra,* is a continuation of the old term and is not a part of the new term even though the statutory period constituting that new term has started. Since it is a continuation of the old term, and since the Constitution prohibits the raising of an officer's salary during an existing term, Brothers was serving an "existing term" during this holdover period, rather than a new term, and was, therefore, entitled to receive a salary at the rate of the annual salary of $8,400 and not at the increased rate of $12,000 annually for this period of holding over from February 8, 1965, to the time when his successor's appointment was completed by operation of law on September 1, 1965.

ZIMMERMAN and BROWN, JJ., concur in the foregoing dissenting opinion.