THE STATE, EX REL. CHANNING, *v.* RHODES, GOVERNOR, ET AL.

[Cite as State, ex rel. Channing, v. Rhodes (1976),
45 Ohio St. 2d 351.]

(No. 75-570—Decided March 31, 1976.)

354

“ ⁂ ⁂ ⁂

357

*Messrs. Teaford & Bernard, Mr. Hamilton J. Teaford* and *Mr. Jeffrey A. Rich,* for relator.

*Mr. William J. Brown,* attorney general, *Mr. Joseph E. Scuro, Jr.,* and *Mr. David H. Beaver,* for respondent James A. Rhodes, Governor.

*Messrs. Bricker, Evatt, Barton & Eckler, Mr. William R. Chadeayne* and *Mr. G. Roger King,* for respondent Ohio Air Quality Development Authority.

WILLIAM B. BROWN, J. This case invokes the original jurisdiction of this court in mandamus, and presents the

question whether the respondents, the Ohio Air Quality Development Authority and Governor James A. Rhodes, have illegally acted to deprive relator, Gayle S. Channing, of her membership in the Authority.

Membership qualifications for the Authority are set forth in R. C. 3706.02, which reads, in pertinent part, as follows:

"There is hereby created the Ohio Air Quality Development Authority. Such authority is a body both corporate and politic in this state * * *.

"The authority shall consist of seven members as follows: five members appointed by the Governor, with the advice and consent of the Senate, no more than three of whom shall be members of the same political party, and the Director of Environmental Protection and the Director of Health, who shall be members ex officio without compensation. Each appointive member shall be a resident of the state, and a qualified elector therein. * * * Appointed members' terms of office shall be for eight years, commencing on the first day of July and ending on the thirtieth day of June. Each appointed member shall hold office from the date of his appointment until the end of the term for which he was appointed. Any member appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed shall hold office for the remainder of such term. Any appointed member shall continue in office subsequent to the expiration date of his term until his successor takes office, or until a period of sixty days has elapsed, whichever occurs first. A member of the authority is eligible for reappointment. Each appointed member of the authority, before entering upon his duties, shall take an oath as provided by Section 7 of Article XV, Ohio Constitution. The Governor may at any time remove any member of the authority for misfeasance, nonfeasance, or malfeasance in office. * * * Four members of the authority shall constitute a quorum, and the affirmative vote of four members shall be necessary for any action taken by vote of the authority. No vacancy in the membership of the authority shall impair the rights of a quorum

by such vote to exercise all the rights and perform all the duties of the authority.

"Before the issuance of any air quality revenue bonds under Chapter 3706 of the Revised Code, each appointed member of the authority shall give a surety bond to the state in the penal sum of twenty-five thousand dollars and the Secretary-Treasurer shall give such a bond in the penal sum of fifty thousand dollars, each such surety bond to be conditioned upon the faithful performance of the duties of the office, to be executed by a surety company authorized to transact business in this state, and to be approved by the Governor and filed in the office of the Secretary of State. Each appointed member of the authority shall receive an annual salary of five thousand dollars, payable in monthly installments. Each member shall be reimbursed for his actual expenses necessarily incurred in the performance of his duties. * * *"

Relator alleges that Governor Gilligan's appointment and the Senate's advice and consent thereto were legal and proper and vest her with membership in that Authority; that R. C. 3706.02 has been complied with; that her attempts to give a surety bond pursuant to R. C. 3706.02 have been frustrated by the Governor's refusal to approve such bond; and that the Authority cannot bar her participation in its business nor bar her from receiving compensation.

Respondents deny that relator is a duly appointed and qualified member of the Authority, for the following reasons: (1) The appointment is invalid or incomplete because (a) it is inscribed with a facsimile signature rather than the handwritten signature of Governor Gilligan, in contravention of R. C. 107.15, and (b) the appointment is not recorded in the appointment record kept in the Governor's office, in contravention of R. C. 107.10(B); (2) the appointment was improperly transmitted to the Senate; (3) the appointment was withdrawn by Governor Rhodes before the Senate vote to advise and consent; and (4) the surety bond requirement of R. C. 3706.02 has not been met by relator thus constituting a refusal of office pursuant to R. C. 3.30. We shall address those arguments gradatim.

#### The Appointment

R. C. 107.15 empowers the Governor to utilize a "fac-simile signature," as defined therein, on "any document *except* enrolled bills enacted by the General Assembly, *nominations to be submitted to the Senate for confirmation,* clemency actions, interstate compacts, and agreements with the federal government * * *." (Emphasis added.) Without deciding whether the Governor may properly authorize use of his facsimile signature on documents purported to be excepted from R. C. 107.15, we need only determine herein whether relator's Letter of Appointment is a *nomina-tion* to be submitted to the Senate for *confirmation,* within the meaning of R. C. 107.15.

Members of the Authority are "appointed by the Governor, with the advice and consent of the Senate." At least 114 sections of the Revised Code provide for gubernatorial appointments with the Senate's advice and consent.[1] See, also, Section 21 of Article III, Section 22 of Article IV, and Section 2 of Article VII of the Ohio Constitution. Only R. C. 107.15 mentions a gubernatorial *nomination* followed by Senate *confirmation.* Two forms of officer selection do exist. As Judge Matthias stated in *State, ex rel. Brothers, v. Zellar* (1966), 7 Ohio St. 2d 109, 112:

"It must be noted at the outset that unlike the practice in some states where the Governor *nominates* an individual for an office and such nomination is sent to the

---

[1] See, e. g., R. C. 102.05, 103.58, 109.71, 120.01, 121.03, 121.08, 122.-37, 122.40, 122.64, 124.05, 128.03, 143.021, 145.382, 149.301, 149.303, 149.312, 151.21, 152.01, 173.01, 301.14, 311.25, 991.02, 1127.02, 1501.04, 1503.40, 1509.38, 1513.05, 1515.02, 1517.03, 1531.03, 1541.40, 1543.03, 1547.73, 3304.12, 3332.03, 3333.01, 3335.02, 3337.01, 3337.10, 3339.01, 3341.02, 3343.02, 3344.01, 3350.01, 3351.06, 3352.01, 3353.02, 3354.05, 3356.01, 3357.05, 3358.03, 3359.01, 3360.01, 3361.01, 3377.03, 3706.02, 3713.04, 3745.02, 3769.02, 3769.084, 3769.085, 3769.086, 3770.01, 3770.02, 3781.07, 3781.19, 3929.43, 4112.03, 4121.02, 4121.12, 4121.123, 4123.14, 4141.02, 4141.06, 4141.08, 4151.14, 4161.12, 4301.022, 4517.09, 4701.02, 4703.01, 4707.03, 4709.01, 4713.02, 4715.02, 4717.02, 4723.01, 4723.02, 4725.03, 4729.01, 4731.01, 4732.02, 4733.03, 4734.01, 4735.03, 4741.02, 4747.03, 4753.03, 4901.02, 4906.02, 4981.02, 5119.80, 5122.54, 5125.14, 5139.01, 5315.02, 5507.01, 5537.02, 5538.23, 5703.03, 5907.02, 5909.02, 6113.02, 6121.02.

Senate for *confirmation* before the appointment is made, the procedure in Ohio is that the *appointment* is actually made by the Governor prior to its submission to the Senate." (Emphasis added.)

Accordingly, this court holds that the use of a facsimile signature on a Letter of Appointment, which is authorized by the Governor to be prepared, does not contravene the provisions of R. C. 107.15.

Respondents assert further that the appointment is incomplete because it is not recorded in the Governor's record, as required by R. C. 107.10, which, in pertinent part, reads:

"The following records shall be kept in the Governor's office:

"* * *

"(B) An appointment record in which is entered the name of each person appointed to an office by the Governor, except notaries public and commissioners, the office to which appointed, the date of the appointment, the date of the commission, the date of the beginning and expiration of the term, and, the result and date of action by the Senate, if required."

Respondents' assertion cannot be sustained because the language of R. C. 107.10(B) itself clearly shows that recordation is not contemplated until after the Senate has acted on the appointment. The recordation requirement is to set forth a *history* of each appointment, at some time after the end of the process of appointment and advice and consent. Relator's appointment has not been recorded, first, because Governor Rhodes has contested the appointment, and, secondly, the Gilligan administration ran out of time to so record it.[2]

---

[2]Miss Sara Sibley states in her deposition:

"* * * At the time that we left finally on January 13, we had simply run out of time and people to complete the recording in this document. The staff had dwindled somewhat by that time. We had a good deal of work to complete, and at the time I left the Governor's office, I left in the vicinity of the appointments office where I had worked, a pile of the remaining appointments that needed to be recorded in that book. It was my understanding that as a public document, everything had

We hold that relator's claim to office is not dependent upon recordation of the history of her appointment in the Governor's record.

### The Transmittal

Respondents challenge the validity of the transmittal of relator's Letter of Appointment to the Senate. That claim is based upon the assumption that the evidence "establishes beyond any reasonable doubt that relator's purported nomination was not, in fact, delivered to the [Senate] Clerk's office until Monday morning, January 13, 1975." Respondents conclude, then, that the appointment "* * * was not transmitted to the Senate until *after* Governor Gilligan's term of office had expired and then by an unknown person who was neither a member of Governor Gilligan's staff nor a member of Governor Rhodes' staff and who was not authorized by Governor Rhodes to do so.

"In these circumstances the best that can be said for relator's alleged appointment as a member of respondent Authority is that Governor Gilligan *intended* to appoint her to that office but the fact remains that that intention was never executed in the manner required by law before Governor Gilligan's term of office expired." (Emphasis *sic*.)

Upon reviewing the evidence, we do not accept respondents' premise that transmittal occurred on January 13. Rather, the clear testimony of Miss Sibley is that on January 11, 1975, she handed over the Letter of Appointment to a "reputable person associated with the Ohio Senate in some way that would deliver those [the appointments] upstairs." We reject respondents' allegation of improper transmittal.

### The Withdrawal

Respondents state as their position "that the Governor

---

to be recorded in that book and I did not want to leave the current administration with some missing materials. I left those there in a pile so that they would be able to record them as they had time. I specifically made it clear that I would be available for any assistance if there was any thing I could help with, anything that was confusing in it in terms of the material we just left, and I was never contacted with any inquiries as to what the situation was."

may, upon his judgment and discretion, withdraw an appointment before confirmation by the Senate," and allege that "[o]n January 13, 1975, acting within his discretion, the Governor [Rhodes] ordered a member of his staff to recall the alleged appointment of relator from the Clerk of the Senate. However, the Clerk of the Senate refused to relinquish the alleged appointment and said appointment was acted upon by the Senate on January 14, 1975. Thus, in failing to comply with the Governor's recall the Senate wrongfully confirmed the relator's alleged appointment."

We need not decide whether a Governor is empowered to withdraw or recall appointments after they have been submitted to the Senate for its advice and consent, because, again, the evidence presented does not sustain respondents' allegations. There is no evidence that Governor Rhodes issued any orders in relation to the appointment of relator or other appointments handed down to the Senate on January 13, 1975. There is evidence, however, that the Clerk of the Senate, William H. Chavanne, submitted those appointments "to the Senate" as the Senate went into session, which occurred at 10:30 a. m. on January 13, 1975. Mr. McElroy testified that after Governor Rhodes was sworn in, which was "[s]imilar to noonish" on January 13, he [Mr. McElroy] stated to Mr. Chavanne, "that, 'The Governor has recalled the nominations that were sent up there earlier this morning.'"

There is no evidence that the "Senate Clerk refused to relinquish the * * * [letter of] appointment," as alleged by respondents. Rather, it would appear that relator's Letter of Appointment was out of Mr. Chavanne's hands by the time he was informed that the Governor possibly opposed the appointment. After Mr. Chavanne submitted the appointments "to the Senate," they went to the Rules Committee and were consented to the next day. There is no evidence that the Governor, Mr. McElroy, or other members of the Governor's staff further attempted to bring news of the purported withdrawal to the Senate. For the foregoing reasons, we must conclude that there was no effective communication to the Senate of a gubernatorial

withdrawal of appointment, even if the Governor so intended to withdraw or recall relator's appointment.

### The Surety Bond

Paragraphs 13-15 of the agreed statement of facts read:

"13. Gayle S. Channing submitted a surety bond in the penal sum of $25,000 conditioned upon the faithful performance of the duties of the office of a member of the Authority which bond was executed by Aetna Casualty & Surety Company, a surety company authorized to transact business in Ohio. This submission was made by an agent of Ms. Channing to a member of Governor Gilligan's staff in the office of the Governor of Ohio prior to noon—prior to the inaugural ceremony of Governor Rhodes—on January 13, 1975.

"14. The Authority received an invoice dated March 11, 1975, for the premium on said surety bond which such premium has not been paid by the Authority. It is the practice of the Authority to pay ultimately bond premiums on surety bonds which have been approved by the Governor for members of the Authority who have been duly appointed and who have duly qualified for such office.

"15. Governor Rhodes has not approved Gayle S. Channing's surety bond and has not forwarded said bond to the Secretary of State of Ohio for filing."

Upon those facts, respondents argue that inasmuch as the invoice has not been paid, the bond is "cancellable by the insurance company. The bond has thus become insufficient as to its surety and is worthless as a surety instrument for the purpose for which it was intended.

"Pursuant to Section 3.30 Ohio Revised Code,[3] a per-

---

[3] R. C. 3.30 reads:

"A person elected or appointed to an office who is required by law to give a bond or security previous to the performance of the duties imposed on him by his office, who refuses or neglects to give such bond or furnish such security within the time and in the manner prescribed by law, and in all respects to qualify himself for the performance of such duties, is deemed to have refused to accept the office to which he was elected or appointed. Such office shall be considered vacant and shall be filled as provided by law."

son appointed to an office who fails to furnish such security as provided by law is deemed to have refused to accept the office to which such person was appointed. The only conclusion that can be drawn from relator's failure to validate the surety bond is that she has not qualified for the position at issue in this case.''

The bond requirement in R. C. 3706.02 reads:

''Before the issuance of any air quality revenue bonds under Chapter 3706 of the Revised Code, each appointed member of the authority shall give a surety bond to the state * * * to be approved by the Governor and filed in the office of the Secretary of State.''

This court holds that such bond requirement does not purport to be a qualification for membership in the Authority, but, by the terms of R. C. 3706.02, is merely a precondition to the issuance of revenue bonds by the Authority. Accordingly, consideration of surety bonds is not pertinent to this action.

### Conclusion

In consideration of the foregoing, we find that relator was appointed by the Governor to a seat on the Authority, that such appointment was unanimously advised and consented to by the Senate, and relator served, in full compliance with the qualifications for office set forth in R. C. 3706.02, until excluded from service by the actions of respondents. Respondents have shown no legal basis for so excluding relator. Therefore, a writ will issue.

*Writ allowed.*

O'NEILL, C. J., HERBERT, STERN and P. BROWN, JJ., concur.

CORRIGAN and CELEBREZZE, JJ., dissent.